Mrs. Cassidy Good morning. Good morning. I represent Ricky Johnson on appeal from his conviction. I'd like to first focus on the dismissal of the 12th juror over objection. The government concedes that the district court had no authority to dismiss the 12th juror and proceed with 11 before deliberations. Rule 23B is clear. This can only be done with written consent of both parties. The defense objected. The only question is whether it can be overlooked as harmless or requires reversal. It requires reversal. This is structural error because it affects the very framework of the trial and its effects are necessarily unquantifiable and indeterminate. In other words, it is just not amenable to harmless error analysis. There is no logical way to assess the impact of losing the 12th juror. It is the kind of error that Justice Scalia addressed in Sullivan v. Louisiana. Why is that? Why can't we look at the evidence? Is it overwhelming evidence of guilt or not? There was not overwhelming evidence of guilt, but that's my second point. Theoretically, why couldn't we do that? Because no one can know what the 12th juror would have brought to the jury room. Each juror comes to the jury room with his own life experience. But don't we often make those kinds of judgments on harmless error analysis? We say, well, if this piece of evidence was not before the jury, we think the jury would have reached the same conclusion anyway. Exactly. We're making a judgment as to what jurors would conclude based on evidence that's different from what they actually saw. There's some analysis there, but why can't we do that about a hypothetical 12th juror? Because the kind of error that Your Honor is speaking about is a defect in the presentation of evidence, which has been distinguished from this kind of error, which does not involve any flaw in the evidence or any missing element or error in the presentation of evidence. Well, it involves an error by the district court, right? The district court erred in proceeding with 11 jurors. Yes. Right, and so the question is did that change the outcome of the trial? And it doesn't seem very different the way in the normal case we look at the strength of the evidence to decide whether it would have come out differently. Well, the reason that harmless error looks at the strength of the evidence is in the context of a trial error which affects the evidence, which affects the pool of evidence that the jury heard. For example, a jury charge error on how to consider the evidence or a missing element as a needer. And in that case, it makes sense. You know, when we do that, we have a fixed, we have the 12 jurors, and they saw something and reached a conclusion, and we speculate maybe the thing was different. But if there's a juror missing, like a whole other person, it's just too different. Exactly. That's exactly it. But don't you have another problem, which is haven't we said that a structural error has to be something that's protected by the Constitution, and the Supreme Court has told us that the 12 juror requirement is not a constitutional requirement? Well, it's not accurate quite that the Supreme Court has never said that only constitutional error can be structural. There are no cases that say that. The cases that the government cites are cases in which the constitutionality of the error was a given, and the court said not every constitutional error is structural. So there's no rule that it has to be constitutional, and the Corbello Court addressed that head on and rejected that argument. May I ask you this? Twice, at least, this circuit has dealt with issues where a district court errantly constituted the jury. There's a case in which the court sat an alternate in lieu of a regular appended juror, and there's a case in which the district court seated alternate two when they should have seated alternate one. And this circuit not only applied harmless error analysis, they rejected the claim as clearly harmless in a summary order, no less. Given that, we're not talking here about evidentiary error, we're talking about the construct of a jury. We have literally a missing juror, as we do here. Why is this any different? Well, it's different because those cases don't involve a missing juror. There are 12 jurors, but it's a question- Well, you're missing the 12th. The 12th was not there. It happened to have been that another errant person crept in in that person's space, but just as here, the 12th juror was missing. In those cases, I believe there were 12 jurors. There's a case called Hamed from 2008, a case called Hiltz from 2018, summary orders finding no prejudice, no harm, where essentially you have 11 correct jurors and a 12th, if you will, interlocutor. So those are more similar to the peremptory strike cases, in which harmless error is applied, because you can look at the ultimate jury that was selected and determine whether it was a fair and unbiased jury. Except that the inquiry that the court, the Second Circuit, appears to have done in these summary orders was to take a look at the evidence and to say nothing to see here. Well, if that's what they did, that was an incorrect approach, and those are summary orders. Summary orders have no precedential value. They have persuasive force. But if we look at all of the Supreme Court cases, Sullivan, Gonzalez-Lopez, which reaffirmed the concept that an error that affects the trial mechanism, like this, and not the presentation of evidence, its impact can't be quantified. Let's assume that we were to take the view that this was subject to harmlessness analysis. The evidence in this case was awfully streamlined. It's essentially the content of the Instagram posts and the downstream reaction to some degree to them. But that's about it. There wasn't a deep dive into the life history or other communications, for example, of the defendant. Under those circumstances where there's a threat to kill in black and white in the text of the Instagram posts, if we're allowed to consider harmlessness, why was this harmful? Okay. This error could not have been harmless in this case because this jury improperly constituted 11 jurors. Those 11 jurors struggled with the evidence over two full days and actually delivered a partial acquittal. So this jury, anything could have happened. It could have come out with a complete acquittal had there been a 12th juror. We don't know what went on in the jury room. We don't know why they acquitted on one of the counts. We know that they struggled and sent out many notes, one of which was, can we acquit the defendant on grounds of mental defect? They acquit on the Bulbert count, right? Yes. As you see it, is there any meaningful distinction in the evidence between that count and the others? No. If you look at the statements made, they were virtually identical. They were the same statements. No, there is no real meaningful distinction. So you're saying there's no principle, it doesn't make any sense that they acquitted on one count and convicted on the others. Who knows what could have happened if there was a 12th juror? That's your argument? I'm not saying it doesn't make any sense. We just don't know. We just don't know what the basis was. And this court can't speculate. This court cannot speculate as to what – It doesn't have to be that the 12th juror would have, but could have. Could the 12th juror have made a difference? So because 11 jurors were willing to acquit on the one count that looks a lot like the other counts, maybe a 12th juror would have acquitted on the others. Maybe that 12th juror would have brought a perspective that was stronger in favor of acquittal on all counts and would have had a particular ability to persuade the others and turned the whole thing around. That's at a level of theory that would defeat the whole idea of harmless error review. I'm trying to anchor, and I think Judge Banasch is trying to anchor you in the nature of the proof and the way this case was tried and why it is that we cannot have confidence that a differently constituted jury would have come out differently. And I think your point is that if the jury could have acquitted on the Bobert count, which was meaningfully indistinguishable, there was something to talk about here, and we can't. And based on the facts here, it's harder to project what would have happened. Exactly. And the test is not whether the court has confidence that the juror would have changed the result, but whether it has confidence that it would not. Right. And the evidence, as Your Honor pointed out, it was very straightforward because there was a deep dive into the defendant's computers. They seized his computers and phones and found nothing. It's not that there was no deep dive, it was that there was nothing else. There was no Google search of the subjects of his rants. There was no, like, trying to find their address. He called Joe Manchin, Steve Manchin. There was a lot of evidence that undermined, or lack of evidence, that undermined the seriousness of the threats. So because Rule 23 maybe in this circumstance doesn't envision an 11-person jury, it does envision in some circumstances an 11-person jury, right? So if that's true, that the rule envisions that sometimes you can have a fair trial with 11 persons, how could it be such a fundamental defect that it affects the whole trial that we had 11 persons here? Well, the advisory committee notes explain that amendment that was introduced in the 80s after Williams. And by the way, we contend in our brief for preservation purposes that there is a Sixth Amendment right to a 12-person jury and that the law is in flux and we expect that Williams will be overruled at some time. But we understand that you're bound by Williams. But the reason for that amendment after Williams was that there had been a few prominent RICO cases. But they lasted months and the jury was in the midst of deliberations, but the alternates dismissed and somebody had a heart attack or was incapacitated. And so the committee introduced this new exception that was very limited only after deliberations. So even in a lengthy trial, you can't dismiss the 12th juror before deliberations. And it's just the bright-line rule that they drew that the exception is supposed to be narrow. They explained that it shouldn't even be done in short trials. That it should only be done where a lot of time has been expended. Go ahead. I understand that. So you said a moment ago that an error doesn't have to implicate a constitutional right to be a structural error. You said the Supreme Court hadn't said that. But I thought we said that. So in Bentley v. Scully, didn't we say a structural error involves the deprivation of a constitutional protection so basic that in its absence a criminal trial cannot reliably serve its function, and so on? I believe those couple of cases- Haven't we said that it has to be a constitutional right? Well, I believe those cases, it's dicta, that that wasn't necessary to the holding. That wasn't the issue was whether it was constitutional or not. You have said, at least, that it has to be a constitutional right. But you said you think we should distinguish that as dicta and not follow it here. Yes, exactly. And we should not follow it here because we should say that there's a separate class of structural errors where it doesn't involve the deprivation of a constitutional right. It's just that it's hard to tell whether something is harmless or not. Well, you can't use traditional harmless error analysis to measure the impact of the error, exactly. And if I could just say, every circuit to have considered this has held that harmless error does not apply. Corbello is the most fully reasoned decision in the Fourth Circuit. But there's no case in which a circuit has applied harmless error to a Rule 23b violation. The D.C. circuits, the Seventh Circuit, have all, not using the term structural error but similar analysis, refused to apply any harmless error or prejudice standard and simply reversed. So this Court would break no new ground in simply following Corbello. Well, you just said we had to disagree with what we said in prior cases. And maybe you're saying it's dictated and we're allowed to do that. But we would have to break the new ground of saying that a structural error does not have to involve deprivation of a constitutional right. Right. And in those cases, as I said, that wasn't necessary to the whole. It was just kind of verbiage dicta. Okay. So. Thank you. You've reached your time for rebuttals. We'll hear from you again. But let's hear from the government. Mr. Werschba. Thank you, Your Honors. May it please the Court. My name is Kyle Werschba for the government, and I prosecuted the case below. Your Honors, I'm happy to start to pick up on something that the Court was inquiring about, which is the fact that I think this Court has been entirely clear that structural errors must be constitutional. This Court has said it on multiple occasions, and I think that it remains to be the case. If you examine the actual errors that this Court and the Supreme Court have found to be structural, it is clear that those errors are constitutional. They are serious errors of constitutionality. Those include the denial of counsel of choice, denial of self-representation, coerced confessions, exclusion of jurors on the basis of race. These are things that are at the core of constitutionality. And in the 2013 case, Moran-Tawala, this Court said that all of the structural errors that it identified were involving violations of bedrock constitutional principles. There are cases that say if an error has consequences that are necessarily unquantifiable and indeterminate, that that is, whether you want to call it a structural error or not, that you don't need to consider the harm. Why doesn't this fall precisely into that language? Because we don't know what effect the twelfth juror would have had. Understood, Your Honor. And I think the important thing is what Judge Minashi discussed earlier, which is that it's often the case that we ask courts to consider things that are difficult to quantify. It is often the case that courts will look at a record and determine, even in situations that are difficult to quantify, as Judge Engelmeyer was citing, whether there was a different juror as opposed to a missing juror, that we engage in harmless error and this Court engages in harmless error. But you're ignoring the proposition that where an error has consequences that are unquantifiable and indeterminate, that you don't need to show harm, because you can't show harm. Your Honor, I think you can show harm in certain cases, but the government's position is that you cannot show harm in a case like this one, where the evidence was overwhelming, where there was a clear threat. The evidence was overwhelming in this case? Yes, Your Honor. That is the government's position. The jury left us with a clue. The jury acquitted on a count that is factually, although perhaps nominally distinguishable, substantially coterminous with the counts of conviction, whatever their basis was. Who's to say that a twelfth juror might not have seen counts 1, 2, and 4 as like count 3? The evidence doesn't clearly distinguish them. Well, I think there are things in the evidence that do distinguish that count, which I'm happy to go into, but I think that this court is capable of looking at the record, deciding whether or not that evidence is overwhelming, and making a determination, as it has in other circumstances, that the error is harmless here. In that exercise, are we allowed to consider the clues that the jury that did deliberate left behind, such as the acquittal on count 3? Yes, Your Honor. I think this court can consider those things, although I think that most courts, when looking at these issues, as I recall, look at the evidence itself and make a determination about that. But I understand the court's point. If the jury had convicted on count 3 with 11 jurors, would we say that the error of having 11 jurors was harmless thereto? Well, yes, Your Honor. I believe that we would. If the evidence was overwhelming on count 3, such that any reasonable juror, any 12th juror, would necessarily have voted to convict? Well, Your Honor, I don't want to speculate to precisely what was happening in the jury room, but I will say that the breadcrumbs that the jury left us. The problem is that the jury acquitted, right, on count 3. So if your position is that the evidence was overwhelming, such that any juror would have convicted on count 3, we know that that's not true. Well, Your Honor, first of all, you know, it is possible that the 12th juror would have brought the group around to convict on count 3. We don't exactly know what the issue was with respect to count 3. There were breadcrumbs, however, that I think the jury left us. So first of all, with respect to timing, it was not the case that the jury deliberated for two days and appears to have been struggling with this issue the whole time. The jury deliberated for a couple of hours and then one full day, and at the end of that full day, the jury came back and said, we have a verdict on everything but one count. So if we're going to be thinking about what it was that the jury was doing in that room, it appears— How long was the trial? I'm sorry? How long was the trial? The trial—I apologize, Your Honor, I don't know exactly. I want to say it was three days. I'm not precisely sure. I apologize. Right. I mean, two days of deliberations for a three-day trial seems to me to show the jury was struggling. Well, Your Honor, I think it's clear that the jury was thinking hard about the one count, but— So why—you said a moment ago you think that that count might be different in terms of the evidence. So how is it different? So, Your Honor, I think that one thing that they came through in the evidence was that one of the issues that—one of the ways that the jury instructions allows the jury to consider threats and whether they are true threats is to consider the reaction of the individuals who were receiving those threats. And I think that the record reflects that there was a difference between the way that Senator Manchin's staff reacted and the way that Congresswoman Boebert's staff reacted. Right. And the jury was— And Boebert's staff doesn't request a patrol like Manchin's staff did. Now, let's suppose the twelfth juror says it's Boebert's reaction that is the realistic one, and that Manchin's staff has an eggshell skull. And if the twelfth juror regarded the Boebert reaction as the more natural reaction of an objective recipient to what amounts to the same threat, couldn't the entire verdict have been upset? Your Honor, it is always the case that whether it's a different juror or a new juror or no juror versus a juror that is there, the juror that is missing may have taken the contrary position to the verdict that was ultimately decided. That is always the case. But it is a fact that— No, Your Honor. The issue is not whether he actually intended to kill anyone. The question is one of two options. First is whether he intended it to be a true threat, for it to be perceived as a true threat, or, alternatively, whether a person receiving the threat would have— Okay, so whether he intended it to be a true threat. He's sitting in his living room watching TV. He films—he videos the TV, and he says bad things. Is that overwhelming evidence of an intent to make a true threat? Your Honor, I think it is because the standard is not only whether he intended to actually threaten, but whether he would have understood that in making the threat that a reasonable person would have perceived it as a threat. That is also a theory that is incorporated. In fact, the effect says, I'm going to kill you a number of times. Then he says, you think I'm joking, but I'm not. I'm actually going to do it. You'll see. Right? Your Honor, I think— I don't need to read the threats, but I think they're far more colorful than that, far more specific than that. And the defendant is screaming these things. He is not joking around. He is very serious. As to one of them, the one to Gutfeld, he actually directly communicates it to Gutfeld, whereas with the other three, it's posted on Instagram more generically, right? Well, Your Honor, that's true, although in tagging the other victims, he does all but send those things to their feed. But, yes, in one circumstance with respect to Greg Gutfeld, he sends a direct message that goes only to Mr. Gutfeld, and that Gutfeld clearly felt threatened by. So he took that threat, and as the evidence showed, he then passed that threat along to his security folks at Fox News, saying that he had received a death threat and he was concerned that it included himself and other Fox News personalities who had been referenced in that threat. So, yes, the evidence was that the individuals who received these threats took them extraordinarily seriously, believed them to be true threats, and the jury was entitled to rely on that in considering whether or not a reasonable person would think of these things as threats when they were deliberating in the jury room. And they were entitled to distinguish a reaction that was not as serious from one that was more serious in consideration. But they could have also convicted on the Boebert count if they had regarded the Manchin reaction as the more realistic reaction to what effectively was common language, right? Well, there was common language, certainly, and I can't say, Your Honor, I can't say. But, yes, if they had completely credited the reaction, then it may be the case that they would have convicted on the Boebert count. And the problem for you is that if there had been a unitary conviction down the line, the argument that this is a slam dunk, essentially based on the text of the messages primarily, would be stronger. But with an acquittal on one of the four counts on a fairly slender thread, the argument naturally presents itself who's to say a differently constituted juror what might not have found the Boebert fact pattern the more persuasive one. Well, I think, Your Honor, this court is to say, and I believe that the record is clear that these threats are sufficiently clear in and of themselves that on the counts of conviction that the evidence was overwhelming. So there's a lot of talk about how we do harmless error analysis. So what does the case look like where the error, we can't say that it's harmless. I'm sorry, Judge, I'm not sure I understand the question. What would the case look like? What would change about this case where we would say it's not harmless and we would say that actually the Rule 23 error made a difference? What is based on the credibility of the witnesses? It could be based on the credibility of the witnesses. The witnesses' cases that are If you didn't say I'm going to kill you a number of times, but you said it once to each person, I mean, is that Well, Your Honor, I think that there are certainly cases outside of the threat context that are very close. You could think of cases outside of this context in which there's a long defense case and the theory is tenuous. I can't exactly speculate as to what those cases might look like, but there's no reason that this court needs to concern itself about that possible case. There are cases that will be closer than this one. It's the government's position that the evidence here was strong because of the threats here. And they were repeated. They were angry. They were clear to the people who received them, with the exception perhaps of Boebert's staff, that they were What do you make of the jury's note asking whether it had to convict if it thought he was mentally ill? I'm sorry, Judge, what do I make of that? Yeah, I mean, is that some indication that they were struggling with whether it was a true threat? I don't believe so, Your Honor. I think if anything, that indicates that they were considering something that was not raised appropriately by the defense and therefore was not available to them as a means of resolving the case. Maybe it wasn't raised by the defense, but they had concerns as to whether he was mentally ill. But they apparently did not have concerns. Whether they had those concerns, they did not have concerns about his mens rea. It's yet another indication that the evidence was not overwhelming. Well, I'm not sure that's the case, Your Honor. I think, quite frankly, these threats were so serious. They were so brazen. They were so specific. If he were mentally ill, would that be a basis for acquittal? No, Your Honor, not without appropriately going through the procedures of Rule 12.2 and examinations possibly by the government on a motion. And even if a 12th juror thought he was mentally ill, that would not lead to an acquittal? No, Your Honor, not appropriately under the instructions, not here. So isn't that the answer to the note? I think that was the answer to the note. Yes, Your Honor. Why did the government not stop, say something to Judge Kaplan when he, you concede, dismissed the 12th juror several hours before the point in the process at which he would have had the authority to do so? Well, so I think the answer is, Your Honor, just like Judge Kaplan, the government erred in this case. There is no doubt about it. The government should have caught it, should have raised that with him, and did not do so in time. But I think, Your Honor, it does raise one really important issue that the court didn't discuss with defense counsel, which I want to make sure that the court is focused on, which is what we're talking about here is really a difference in time. Right? It's a couple of hours before there would have been no issue under the rule with dismissing. The evidence was all in at the time of this conference? That's correct, Your Honor. Pre-closing arguments, but post-defense case? Correct, Your Honor. And so we really are talking about the difference of timing. And there's no doubt that- Why does that matter? I mean, if a juror is sitting and hearing the evidence, but then is dismissed before the jury deliberates, like, who cares? It's like saying, well, I sat in class all semester, but I just skipped the exam. Right? That's the whole point. Well, despite the fact that I have that recurring dream, Your Honor, I would say that I don't disagree with you that it is a matter of semantics, but that's what the rule says, right? And so when we're thinking about what that error is, we have to look at the rule. The rule does not allow it before, it allows it after. One concern is if we affirm, here's a blatant violation of the rule, and we're basically giving it a pass. I'm not sure that's different from harmless error analysis in any context, Your Honor. I think that this court, you know, uses harmless- It's a clear violation of the rule. It's clear error. And you're asking us to give it a pass? I'm not asking you to give it a pass, Your Honor. I think the government has conceded that it is error. We have conceded, to Judge Engelmeyer's point, that we erred in not raising this with the court. And then I think the court engages in harmless error analysis in this context. The defense counsel also didn't. The defense counsel objected, but it was really an objection to excusing the 12th juror, not to the rule for what it's worth. I can assure this court that in the future I will be sure to raise the issue if it were to come up in my future trials as a district court. That doesn't help us in this case. Fair enough, Judge Shin. But that's right. The defense says the defense plans to renew its motion for a mistrial on the grounds that Rule 23b.1 makes clear that a jury consists of 12 persons unless the rules provide otherwise. And we do not believe it does. Is that not just saying that Rule 23 did not authorize proceeding with 11 jurors? I think that's absolutely fair. I think the government was not as familiar with that rule at the moment that it came up and so did not object itself, which it should have and would have, had we been more familiar with the rule. So you don't disagree the district court should have granted that motion for a mistrial at that point? Or dismissed the case? Well, I think, Your Honor, that at that point there may have been an opportunity to not dismiss that juror. But I don't want to speculate as to what Judge Kaplan would have done. Of the three jurors who were dismissed, the one as to which there was a plausible basis to delay, which is alternate too, because that person within three hours or even a day would have been back on duty. That juror was dismissed at a time when there was enough cushion that nobody appreciated the significance it would later take on. And from your perspective, the child care one had to go. That person couldn't come back. And from Judge Kaplan's perspective, juror number two had displayed disqualifying bias. That's absolutely correct, Your Honor. I don't think the defense disagrees that it was the only juror's dismissals that are really at issue here are alternate too and juror number two. And with respect to juror number two, when this issue first came up with respect to juror number two, the government didn't immediately move to dismiss the juror. It was only after the inquiry and the discovery of this bias that it became clear to the government and apparently to Judge Kaplan that that dismissal was appropriate. So if you're Judge Kaplan, at the moment that you're ruling on juror number two, at this point you've let the others go. And you believe, if you're Judge Kaplan, that this juror is genuinely unqualified on account of the inferred bias. I take it what you're saying is under the circumstances, Judge Kaplan had no choice. He had to declare a mistrial because if his view genuinely as to that juror is they can't sit, it's not a tenable reaction to say, but I'll keep you anyway because it's the only thing to save the trial. From your perspective in the crucible at that moment, Judge Kaplan only had one choice and it was to declare a mistrial. I think that's likely correct, Your Honor. I'm trying to remember exactly the sequence of the dismissal, the timing of the dismissal of alternate or of the prior juror that was dismissed and whether there could have been perhaps a long adjournment, which would not have been ideal for anyone. But in any event, I think that's fair, Your Honor, that juror number two expressed bias that was inappropriate and it was absolutely within the district court's discretion to remove that juror. The question is one of timing and whether it was before or after deliberations had begun. If the Supreme Court were to adopt Justice Gorsuch's position and say there's a constitutional right to 12 jurors, if we had that situation, would you agree that this is a structural error that requires vacating the conviction? I wouldn't necessarily, Your Honor, and I haven't completely thought through what exactly that would look like. I will say that the Supreme Court has been clear that not all constitutional errors are structural errors. So we would have to think about that. But the bottom line is that as the court has recognized that Williams remains a case that is good law, and this court has repeatedly emphasized that the 12 jurors are not required constitutionally to have a fair and impartial trial. This court did so with quite a bit of analysis, including citing empirical analysis in the Stratton case. And so while it remains the case that jurors as small as six persons under Supreme Court precedent can be constituted legally and under the Constitution, it is certainly the case that what we're talking about here is not a constitutional error and is not a structural one, unless the court has any further questions. Thank you very much, Mr. Gorsuch. We'll turn back to Ms. Cassidy on rebuttal. Ms. Cassidy, before you begin with your rebuttal, I have a question for you. Okay. On one view of the evidence, you simply got lucky to get the acquittal on count three and that the defendant convicted himself by saying to Boebert, I'm going to kill you, et cetera, smile, I'm going to kill you. In Nieder, we were allowed, the Supreme Court authorized a reviewing court to fill in an entire missing element by saying any reasonable jury would have had to have found, in that case, materiality. From the harmlessness perspective, is this a trick question? I mean, if you look at the text of what was said to each of the people here as to true threat, how is it debatable? Put aside the accident of count three and just on the facts, why isn't this an open and shut case? Because Nieder represents exactly the other kind of error, the difference between a structural error, an error that can't be analyzed with respect to the evidence and one that can. In Nieder, the court could look at what was overwhelming evidence of the missing element, whether it was materiality, and the fact that it was not disputed and conclude that no reasonable jury. But the facts are not disputed here. The issue is what conclusion one draws from the words that are used. Exactly. But it's not as if there's a whole complicated set of surrounding circumstances here. The jury is essentially being asked, look at the words used and make a determination. Look at the words used and look at all of the other missing evidence, the lack of any evidence that he had ever intended to do anything about this. Except for doing it to four different people. Except for posting it to his four friends on Instagram. So if this court is going to just look at the evidence that the jury looked at and struggled with, and they did struggle with it, their note about mental health was clearly struggling with the intent issue. There was two days of testimony, less than two, I believe, and the jury was out for two full days, more than two full days, deliberating. The question is whether he intended to communicate a true threat or whether a reasonable person would perceive it as a true threat, right? It's like if he didn't intend to carry it through, does that require an acquittal? I guess you're saying that that's probative of whether he really, whether it really was a true threat. Yes. It is, but he had to have intended. It's not responsive if he didn't intend to. If he did intend to make a threat but wasn't going to follow through, he still would be guilty of making a threat, right? If he had to, the proof had to be that he intended that this threat would be taken seriously and that a reasonable person would have taken it seriously. Those are the requirements of a true threat. And if this court is going to just look at the evidence itself, look at the statements and say, well, we think that of course these were true threats, that is, with all due respect, the court simply replacing the jury with itself. That's not how harmless error analysis works. It works by looking at the evidence. That's exactly what happens in Nieder. I mean, in Nieder, the court replaces, the jury is denied the opportunity to weigh in at all because the element is arrogated to the district court by itself, and the court steps in and says, we're sitting here as the entire jury and we're finding the element in the government's favor. But it's a bit different, Your Honor. It's that the court is looking at the evidence that was presented to the jury and the missing element and the fact that it was not disputed and that the evidence overwhelmingly established that element as an evidentiary matter. You can analyze an error in the context of the evidence if it's an evidentiary error, if it involves the way the jury looks at the error. If it's a missing juror, a defective jury, then that doesn't make any sense because the jury actually, especially here where the jury actually did struggle with the evidence and didn't see this as a slam dunk at all and actually acquitted on one count. And some of the things that, I just want to address a few of the factual issues. You know, in fact, we don't know what any of these subjects thought of the threats. Gutfeld never testified. The only thing we have was a hearsay, which we've also raised as an issue. Note that he sent to Fox News Security in the headline as the caption, death threat. We don't know that he thought that was a real death threat, that he was really scared by that. He never showed up to testify at trial. None of them came to testify at trial, which gave the defense counsel a good argument that they didn't take these seriously. He might have, for all we know, if he had testified, he could have been cross-examined about the fact that he was told to report anything that was a death threat and that that's what he was doing. He just reported anything that was a death threat. And he called it that. No exclamation point. No unconcern. Did you try to call him to testify? Pardon? Did you try to call him to testify? No, we didn't try to call him. But the government didn't call him. He was a complainant. He was a victim, supposedly. So he didn't come to testify. None of the others testified. We don't know what they thought. We don't know what Joe Manchin thought. We know that his chief of staff. If that would have been dispositive or made a difference, why wouldn't you try to call him to testify to get that information? I'm not sure, Your Honor. I wasn't part of the trial team, but, you know. Why is the government required to add to the proof if the text of the threats is as explicit as these appear to be? Well, it's not required to, but it is a lack of evidence. The fact that all they put in was the threats and then the Capitol Police officer, the only additional thing that went to the seriousness of the threats was the Capitol Police officer's testimony. But it isolates it to say all that they put in was the threats. There are four distinct threats at four distinct public officials, each of whom is the target of the same species of threat. But the portrait of this as a light evidence case ignores the fact that it's four separate people who get these threats. It's not somebody a little bit inebriated who one morning wakes up, sends a message, and goes to sleep. It's four concerted sets of threats here. Those are mutually reinforcing. Right. Well, he was sitting in front of his TV, ranting at the TV, and recording himself. So the real point is if the court is going to try to apply harmless error in this case, it can't just be, well, we think the evidence was strong, despite what the jury obviously thought, despite what the jury struggled with the evidence was. It has to look at what actually happened here. And the evidence wasn't strong. I can repeat it, but there was no evidence of anything other than these sort of wild and crazy statements. I think we have that argument. Do you have a final point? Well, I would just like to wrap up by saying the court need break no new ground by following Corbelo and holding that this is structural error. If it does apply harmless error, it will be a conflict. It will create a direct conflict, a circuit conflict. But if it does apply harmless error, this error could not have been harmless. In this case, the missing juror could not have been harmless. Also, I would like the court, I would like to just, if I have time, to briefly address the issue of the opinion testimony, the unlawful opinion testimony of Agent Kelly. Two sentences. Okay. He gave, his testimony was obviously opinion. It was all about how he found these videos serious based on kind of profile-like speak. So he was testifying as an expert with no notice and qualifications, no ability to challenge his expertise, no ability to ask for a deliberate hearing. In fact, the government denies now that he was even an expert. It was not lay opinion because it sounded in profile, in police profile, it sounded like it was based on expertise, carried the aura of expertise. And if it was lay opinion, it wouldn't have been helpful. It wouldn't have been helpful. I think we'll have that argument from the briefs. Okay. Okay, thank you very much. Thank you. Ms. Cassidy, the case is submitted.